UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| AIMEE WHITE, individually and on behalf of K.W., a minor child,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Case No.  C09-5268RJB<br><br>ORDER ON PLAINTIFFS' MOTION TO DETERMINE CHOICE OF LAW AND MOTION FOR PARTIAL SUMMARY JUDGMENT |

This matter comes before the Court on Plaintiffs' Motion to Determine Choice of Law (Dkt. 24) and Plaintiff's Motion for Partial Summary Judgment (Dkt. 26).  The Court has considered the pleadings filed in support of and in opposition to the motions and the file herein.

## I.    FACTS

Plaintiffs bring this action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § *et seq.*, for injuries alleged to have been sustained as a result of Defendant's doctors' negligence. Dkt. 1.

**A.    BASIC FACTS**

On December 22, 2006, 21 year old Plaintiff, Aimee White, went to the Winn Army Community Hospital ("WACH") Family Practice Clinic in Fort Stewart, Georgia.  Dkt. 31, at 1. Plaintiff reported that her last menstrual period was on November 23, 2006, she had taken a home pregnancy test, and the results were positive.  *Id.*  A blood test was done, confirming that she was pregnant.  Dkt. 31, at 22.  During the December 22, 2006, visit, an ultrasound was also

ORDER - 1

performed. Dkt. 31, at 2. No intrauterine gestational sac was seen, but a "small amount of free fluid [was] seen." Dkt. 31, at 2. The radiologist opined that this "most likely represent[ed] an early intrauterine pregnancy." Dkt. 31, at 2.

On January 2, 2007, Ms. White presented at the WACH emergency room, and reported vaginal bleeding. Dkt. 31, at 3. No bleeding was observed. Dkt. 31, at 3. A blood test was done, and her quantitative serum bata-HCG levels were 27,305. Dkt. 31, at 19. Ms. White was asked to follow up with her obstetrician. Dkt. 31, at 4. The emergency room doctor, Dr. Newton's, treatment notes report a vaginal ultrasound showed a yolk sac. Dkt. 31, at 3. The January 2, 2007, ultrasound report, done by radiologist Sol Epstein, M.D., states only "[p]lease see dictated report of exam #06069674." Dkt. 31, at 9. Obstetrician, Lyndon M. Hill, M.D., filed a declaration on behalf of Plaintiffs. Dkt. 26-5. Dr. Hill notes that:

> [T]he ultrasound report of January 2, 2007, was not actually transcribed until 2/5/2007, over a month later. The dictation on 1/3/07 merely states "[p]lease see dictation report of examination number 06069674" - a reference to the transvaginal examination of 12/22/06 that was read by Dr. Williamson. A specific report for this examination was not written by Dr. Epstein. It is important to note that the referenced examination on 12/22/06 did not visualize a gestational sac within the uterus. In reviewing the images of the 1/2/07 examination, there was a distinct difference between the two examinations. A gestational sac with a mean diameter of 1.5 cm, consistent with a 6 week 2 day intrauterine pregnancy, is visible on the second examination and documented in the films, but not in the report. Furthermore, a yolk sac was noted in the gestational sac - further proof of an intrauterine pregnancy. It is a breach in the standard of care for a provider to fail to document the above noted significant change between the two ultrasound examinations.

Dkt. 26-5, at 4. Defense expert, Mize Conner, J.D., M.D., concedes that Dr. Epstein's January 2, 2007, radiologist's report was "abysmal." Dkt. 26-7, at 7.

On January 4, 2007, Ms. White was seen by Toni Sylvester, M.D., in obstetrics. Dkt. 31, at 10. The pelvic examination was unremarkable. Dkt. 31, at 10. A transvaginal ultrasound was performed, but Dr. Sylvester does not document whether or not she saw a yolk sac or gestational sac. Dkt. 31, at 10-12. The defense expert, Mize Conner, J.D., M.D., testified that he didn't "think that it's necessarily below the standard of care for an - - for an ob-gyn in the clinic, with a portable ultrasound machine, to miss a gestational sac." Dkt. 30-3, at 6. Ms. White's blood test showed her HCG level at 27,300. Dkt. 31, at 19. Plaintiff's expert, obstetrician Richard L. Sweet, M.D., testified that this blood specimen was drawn only 40 hours after the January 2,

ORDER - 2

2007, specimen, not at least 48 hours later, and accordingly "precludes any conclusion being drawn from the plateauing HCG levels." Dkt. 26-3, at 5.  Dr. Sylvester testified that she was aware that Ms. White's vaginal bleeding had stopped, and that she was not complaining of pain or cramping. Dkt. 26-8, at 5.  Dr. Sylvester testified that if she had seen an ultrasound report that showed a yolk sac on January 2, 2007, it would have made a difference because it "would have represented a change from the prior study." Dkt. 26-8, at 4.  Dr. Sylvester diagnosed Ms. White with a threatened abortion, suspected missed abortion. Dkt. 31, at 11.  "A missed abortion (an embryonic pregnancy) is when the embryo or fetus has died but remains in the uterus." Dkt. 26-3, at 6.

On January 5, 2007, Ms. White returned and Dr. Sylvester opined that she had a "missed abortion confirmed by falling beta quants." Dkt. 31, at 13.  Dr. Sylvester noted that she denied any vaginal bleeding or pain. Dkt. 31, at 13.  Dr. Sylvester felt Ms. White expressed a "good understanding of the potential risks," and so prescribed Misoprostol, for "medical management." Dkt. 31, at 13.  Misoprostol is given to initiate uterine contractions in order to expel the "products of conception." Dkt. 26-3, at 6.  Defense expert, Dr. Conner, opined that based on the evidence available to Dr. Sylvester, including a history of bleeding, plateauing HCG levels, and the ultrasound information at the time, it was reasonable for her to diagnose a nonviable pregnancy and prescribe medical management. Dkt. 30-2, at 2.  Plaintiff's expert, Dr. Sweet, disagrees, opining that "if the standard of care had been met by Dr. Sylvester on 1/5/2007, within a reasonable degree of medical probability, the presence of a viable pregnancy would have been recognized and misoprostol would not have been given." Dkt. 26-3, at 10.

Dr. Sylvester again saw Ms. White on January 10, 2007. Dkt. 31, at 14.  Ms. White reported that she was not bleeding at the time. Dkt. 31, at 14.  Dr. Sylvester told Ms. White that she had a nonviable pregnancy. Dkt. 26-8, at 6.  Dr. Sylvester reports that Ms. White stated that the Misoprostol "did not complete." Dkt. 31, at 14.  Dr. Sylvester discussed "surgical management" at that time. Dkt. 31, at 14.  Ms. White was reported to agree, and a dilation and curettage ("D&C") was scheduled later in the month so that family members could come and help with Ms. White's other children. Dkt. 31, at 14.  The record does not contain any evidence

1  of the performance of an ultrasound or pelvic examination at this visit. There is no evidence that
2  her HCG levels were tested. Plaintiff's expert, Dr. Sweet, opines that "on 1/10/2007, Dr.
3  Sylvester did not conform with the accepted standard of care by failing to assess for and/or
4  recognize the presence of a viable pregnancy. If the accepted standard of care hd been followed,
5  repeat ultrasound and serum quantitative HCG would have been performed, and the D&C would
6  not have been scheduled." Dkt. 26-3, at 11.

7  Dr. Sylvester performed a D&C on Ms. White on January 26, 2007. Dkt. 31, at 15. The
8  treatment notes do not mention that an ultrasound was performed, nor were blood tests obtained.
9  The uterus was noted to be 8 weeks in size, there was no bleeding noted prior to the procedure.
10 Dkt. 31, at 15. Samples were sent to pathology. Dkt. 31, at 15. Pathology confirmed "chrionic
11 villi" present, which is "consistent with products of conception." Dkt. 31, at 18. Ms. White was
12 asked to return in two weeks for follow up, but failed to keep the appointment. Dkt. 26-8, at 10.

13 On April 3, 2007, Ms. White presented to Madigan Army Medical Center, in Washington
14 ("Madigan"). Dkt. 31, at 24. She reported a large gush of clear fluid from her vagina the night
15 before while traveling across country. Dkt. 31, at 24-25. Plaintiff was found to be 19 weeks
16 pregnant. Dkt. 31, at 27. An ultrasound was preformed and a little amniotic fluid was noted.
17 Dkt. 31, at 27. A fetal heart beat was present. Dkt. 31, at 27. Dr. Tammy Mantzouris and Dr.
18 Jodi Schultz opined that Ms. White had preterm premature ruptured membranes ("PPROM").
19 Dkt. 31, at 27.

20 Dr. Conner, the defense expert, opines that:

21 It's not possible to say if the [D&C] was causally connected to the premature
   rupture of the membrane[s], as premature rupture of membranes is a complication
22 of a pregnancy in which no surgical intervention has occurred. It is also possible
   for a pregnancy in which surgical intervention has occurred to proceed perfectly
23 normally to term and culminate in delivery of a normal infant.

24 Dkt. 30-2, at 2. Dr. Conner further testified that he's "not saying that it's not connected" or that
25 "it is connected," just that, in his opinion, "it's not possible to say one way or the other." Dkt.
26 30-3, at 16. He opines that the use of Misoprostol was not related to the premature rupture of the
27 membranes. Dkt. 30-2, at 2. Plaintiff's expert, Dr. Sweet, opines that:
28 In actuality the D&C was more like a blind (not performed under ultrasound
   guidance, as would normally be done) large chorionic villus sampling (CV) of

ORDER - 4

> placental tissue/extraembryonic tissue. The fetus was not removed, but large portions of placental tissue were removed. The pathology report from 1/26/2007 and the ultrasound on 4/3/2007 confirms this circumstance. As a result of the invasive instrumentation of the intrauterine contents on 1/26/2007, the pregnancy was exposed to an increased risk for preterm PROM, secondary to partial disruption of the normal fusion of the amnion and chrion which constitute the fetal membranes. . . . The preterm PROM was the result of the D&C performed on 1/26/2007.

Dkt. 26-3, at 13.

Plaintiff's expert, Dr. Sweet, opined that "[a]s a result of the PPROM, Ms. White developed oligohydramnios (low amniotic fluid volume)." Dkt. 26-3, at 8. Dr. Sweet states that "[i]n the absence of an adequate amount of amniotic fluid, normal development and expansions of the fetal lungs fails to occur. . . The key period for normal lung development is between about 16-25 weeks gestation when transformation of the previable lung to the potentially viable lung that can exchange gas occurs." Dkt. 26-3, at 8. He further notes that "inadequate amniotic fluid volume may result in abnormal limb development, especially contractures. . . . Other diagnosis included persistent fetal circulation and pulmonary hypertension (resolved), acidosis of newborn, hypotension, and neonatal jaundice." Dkt. 26-3, at 8.

K.W. was born on July 9, 2007, at around 32 weeks of gestation. Dkt. 31, at 30-33. Dr. Sweet, Plaintiff's expert, opined that the "preterm PROM and resulting oligohydramnios also caused premature delivery." Dkt. 26-3, at 14. Prior to birth, no gross structural anomalies were noted. Dkt. 31, at 31. Right after birth, K.W.'s Apgar scores were 7 and 9 at 1 and 5 minutes, respectively. Dkt. 31, at 39. K.W., however, was unable to breathe well on her own at birth, had pulmonary hypoplasia, and "contractures of her extremities." Dkt. 31, at 30-33. She was also diagnosed at birth with hypoxia, metabolic acidosis, left pneumothorax, and hypotension. Dkt. 26-3, at 9, and Dkt. 31, at 33. Plaintiff's expert, Dr. Sweet, opined that:

> The adverse neurologic sequelae present in K.W. are the result of the hypoxia, metabolic acidosis, and hypotension that occurred in the early neonatal period as a consequence of the pulmonary hypoplasis. The pulmonary hypoplasia in turn was caused by the preterm PROM at 19 weeks gestation and the prolonged rupture of membranes and oligohydramnios present until the time of premature delivery.

Dkt. 26-3, at 13. K.W. remained in Madigan's Neonatal Intensive Care Unit until August 6, 2007. Dkt. 31, at 30-33.

On November 30, 2009, K.W. was evaluated by neurologist A. Thomas Collins, M.D. Dkt. 26-9, at 2. Dr. Collins opined that K.W. has mild language delays and mild fine motor difficulties. He further opines:

> Her intelligence was normal. Her gross motor abnormalities center around her right lower extremity orthopedic problems. [He] believes that she has a greater than 50 percent chance of having normal: social, language, fine motor and intellectual function by the time she reaches first grade. . . [He] believes that [her] problems were caused by pre and perinatal issues that include: [PPROM], oligohydramnios and secondary fetal constraint and pulmonary hypoplasia, placental abruption and premature delivery.

Dkt. 26-9, at 2.

### B. PENDING MOTIONS

Plaintiffs now move for an order declaring that Washington law be applied in this case. Dkts. 24 and 28. Defendant opposes the motion, arguing that Georgia law applies. Dkt. 27.

Plaintiffs also move for partial summary judgment requesting an order finding that the government health care providers breached the standard of care and that breach caused Plaintiffs' damages. Dkt. 26. Plaintiffs also seek summary dismissal of Defendant's fourth through ninth affirmative defenses, and it's eleventh affirmative defense. Dkts. 26 and 32. Defendant opposes the motion, except does not oppose the motion regarding: (1) the standard of care pertaining to Dr. Sol Epstein's interpretation of the January 2, 2007, ultrasound, and (2) dismissal of it's seventh affirmative defense. Dkt. 30.

This opinion will first address the motion regarding choice of law (Dkt. 24) and then the motion for partial summary judgment (Dkt. 26).

## II. DISCUSSION

### A. CHOICE OF LAW

The FTCA makes the United States liable "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 13 U.S.C. § 1346 (b)(1). The whole law, including the choice of law provisions, of the state where the act or omission occurred, is to

be applied. *Richards v. United States,* 369 U.S. 1, 8-10 (1962).

It is undisputed that the place were the alleged negligent "act or omission occurred" was Georgia. Accordingly, Georgia's choice of law provision applies. Georgia follows a choice of law doctrine known as the *lex loci delicti* rule. *Dowis v. Mud Slingers, Inc.*, 279 Ga. 808, 816 (2005). Under the *lex loci delicti* rule, "the place of wrong, the locus delicti, is the place where the injury sustained was suffered rather than the place where the act was committed, or, as it is sometimes more generally put, it is the place where the last event necessary to make an actor liable for an alleged tort takes place." *Risdon Enterprises, Inc. v. Colemill Enterprises, Inc.*, 172 Ga.App. 902, 903 (Ga.App. 1984)(holding that South Carolina law applies to claims where airplane crashed in South Carolina - the crash being the final event to make the defendants liable).

Here, the last event necessary to make Defendant liable was when Ms. White began to have complications due to PPROM or at the latest, K.W.'s birth. In either Washington or Georgia, a party is not liable for negligence unless a plaintiff is damaged. It was not until K.W.'s birth, or at least until Ms. White had complications due to PPROM, that Plaintiffs were damaged. Plaintiff's expert, Dr. Sweet, opined that:

> The adverse neurologic sequelae present in K.W. are the result of the hypoxia, metabolic acidosis, and hypotension that occurred in the early neonatal period as a consequence of the pulmonary hypoplasis. The plumonary hypoplasia in turn was caused by the preterm PROM at 19 weeks gestation and the prolonged rupture of membranes and oligohydramnios present until the time of premature delivery.

Dkt. 26-3, at 13. It is undisputed that all complications as a result of the PPROM, and K.W.'s birth, occurred in Washington. Under Georgia's choice of law rule, *lex loci delicti*, Washington substantive law applies.

Defendant argues that under Georgia case law, Plaintiffs' "medical injuries" are confined to the date of the original negligent diagnosis or treatment. Dkt. 27, at 2-4. It cites Georgia Court of Appeals in *Stafford-Fox v. Jenkins*, 282 Ga.App. 667, 669 (Ga.App. 2006), discussing application of the Georgia statute of limitations in medical cases. Dkt. 27, at 3. That Court held:

> This Court has consistently held that in most misdiagnosis cases, the injury begins immediately upon the misdiagnosis due to the pain, suffering, or economic loss sustained by the patient from the time of the misdiagnosis until the medical

ORDER - 7

problem is properly diagnosed and treated. The misdiagnosis itself is the injury and not the subsequent discovery of the proper diagnosis; thus, the fact that the patient did not know the medical cause of his suffering does not affect the applicability of OCGA § 9-3-71(a).

Defendant further cites *McCord v. Lee,* 286 Ga. 179, 180 (2009), affirming that "[i]n most cases of negligent treatment and in most cases of misdiagnosis, the statute of limitation for medical malpractice will begin running at the time of the treatment or misdiagnosis. That is the time that the injury generally occurs." Defendant argues then, that the time of the "injury" here was the date of the misdiagnosis or negligent treatment. Dkt. 27, at 3-4.

Plaintiffs point out that the cases cited by Defendant relate to application of the statute of limitations and not to the choice of law doctrine. Dkt. 28. Moreover, the Georgia courts note that the injury "begins immediately upon the misdiagnosis due to the pain, suffering, or economic loss sustained by the patient." *Stafford-Fox*, at 669. Here there is no evidence that Ms. White was in pain, was suffering or had economic loss until after she had complications resulting from the premature rupture of her membranes. It appears that she was unaware that she was still pregnant until she appeared in the emergency room at Madigan. Dkt. 31, at 24-25. Washington substantive law applies.

**B.     SUMMARY JUDGMENT - STANDARD**

Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the non moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."); *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions

of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*. Conclusory, non specific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

**C.   SUMMARY JUDGMENT RE:  BREACHES OF THE STANDARD OF CARE**

Under Washington law, a plaintiff alleging professional negligence against a hospital or licensed physician must show by a preponderance of the evidence "that the defendant or defendants failed to exercise that degree of skill, care, and learning possessed at that time by other persons in the same profession, and that as a proximate result of such failure the plaintiff suffered damages." RCW § 4.24.290.

1.   *Ultrasound Findings on January 2, 2007*

Plaintiffs seek an order holding that the Defendant's health care providers breached the standard of care by failing to document the ultrasound findings on January 2, 2007. Dkt. 26, at 6. Defendant concedes that Dr. Epstein breached the standard of care in failing to document the ultrasound findings of January 2, 2007. Dkt. 30. Plaintiffs' motion should be granted as to him.

2.   *Ultrasound Findings on January 4, 2007*

Plaintiffs seek an order holding that Dr. Sylvester, the government obstetrician, breached the standard of care by failing to recognize the presence of the yolk sac on an ultrasound performed two days later on January 4, 2007. Dkt. 26, at 9.

Plaintiff's motion on this issue should be denied. Defendant has pointed to the testimony

ORDER - 9

of Dr. Conner, who opined that it was not below the standard of care for an "ob-gyn in the clinic, with a portable ultrasound machine, to miss a gestational sac." Dkt. 30-3, at 6. Defendant has shown that there are sufficient issues of fact to preclude summary judgment on this point.

         3.    *Diagnosis of Missed Abortion*

Plaintiffs move for an order that the government providers breached the standard of care by misdiagnosing a missed abortion. Dkt. 26, at 10.

Plaintiff's motion should be denied. Defendant has shown a material issue of fact exists by pointing to the testimony of Dr. Conner. Dr. Conner opined that, based on the evidence available to Dr. Sylvester, including a history of bleeding, plateauing HCG levels, and the ultrasound information at the time, it was reasonable for her to diagnose a nonviable pregnancy and prescribe medical management. Dkt. 30-2, at 2. Moreover, he testified that it was reasonable for her proceed with surgical management. *Id*.

**D.    SUMMARY JUDGMENT RE:  CAUSATION**

Plaintiff moves for an order finding that government's negligence in performing a D&C on a viable pregnancy caused the PPROMS, which caused all the damages in this case. Dkt. 26, at 11.

Plaintiff's motion on the issue of causation should be denied. Defendant has pointed to sufficient issues of fact to preclude summary judgment on this issue. Dr. Conner, the defense expert, opines that:

> It's not possible to say if the [D&C] was causally connected to the premature rupture of the membrane[s], as premature rupture of membranes is a complication of a pregnancy in which no surgical intervention has occurred. It is also possible for a pregnancy in which surgical intervention has occurred to proceed perfectly normally to term and culminate in delivery of a normal infant.

Dkt. 30-2, at 2. Accordingly, the motion should be denied on this issue.

**E.    SUMMARY JUDGMENT RE:  AFFIRMATIVE DEFENSES**

Plaintiffs seek summary dismissal of Defendant's fourth - ninth affirmative defenses, and its eleventh affirmative defense. Dkt. 26. Defendant concedes that its seventh affirmative defense should be dismissed.

         1.    *Affirmative Defense Number Four*

1       Defendant's fourth affirmative defense is: "Plaintiffs' claims are subject to the limitations
2   of the substantive law of the State of Georgia; both statutory and common law." Dkt. 14, at 4.
3   Plaintiff's motion to dismiss this affirmative defense should be denied as to the question of
4   which state's choice of law governs and granted in all other respects.  As above, in Section II. A.
5   of this opinion, Georgia choice of law governs this case.  Under the Georgia rule, Washington
6   State's substantive provisions should be applied.

          2.       *Affirmative Defense Number Five*

8       Defendant's fifth affirmative defense is that: "[th]e injuries and damages alleged in
9   Plaintiffs' Complaint were not proximately caused by or contributed to by any negligent or
10  wrongful act or omission of any agent, employee, or representative of the United States." Dkt.
11  14, at 4.  There are issues of fact as to causation, as discussed in Section II. D. of this opinion.
12  Plaintiff's motion to summarily dismiss Defendant's fifth cause of action should be denied.

          3.       *Affirmative Defense Numbers Six and Nine*

14      Defendant's sixth affirmative defense is: "Plaintiffs' injuries and damages, if any, were
15  caused by their own negligent acts or omissions, wrongdoing, or failure to exercise due care on
16  their parts;" and the ninth affirmative defense is: "Plaintiffs' claims are barred or diminished as a
17  result of their negligent acts or omissions, wrongdoing, and failure to exercise reasonable care in
18  mitigating their damages." Dkt. 14, at 5.

19      Plaintiffs move to dismiss these affirmative defenses, arguing that there is no evidence of
20  negligence on their part which would have caused their injuries and damages.  Dkt. 26.
21  Defendant points to the opinion of Dr. Conner, who states in his report that: "[i]t is not
22  necessarily below the standard of care to fail to interrupt an intrauterine pregnancy at the time of
23  dilatation and curettage.  Dr. Sylvester had no opportunity to recognize this failure since the
24  patient failed to keep her follow-up appointment." Dkt. 30-2, at 2.

25      Plaintiffs' motion to summarily dismiss these two affirmative defenses should be granted.
26  Defendant's expert provides no connection between Ms. White's failure to keep her appointment
27  and injuries and damages here.  Defendant does not state what care, if any, would have resulted
28  if Ms. White had kept her appointment.  Defendant's supposition, that Dr. Sylvester would have

ORDER - 11

realized that the D&C was incomplete at this appointment, rests on the assumption that she would have recognized a viable pregnancy at that point, and there is no evidence to support that assumption. Plaintiffs' motion to summarily dismiss Defendant's affirmative defenses six and nine should be granted.

    4.  *Affirmative Defense Number Eight*

Defendant's eighth affirmative defense is that: "Plaintiffs' injuries and damages, if any, were caused by other preexisting or unrelated sicknesses, injuries, or other medical conditions." Dkt. 14, at 5. Plaintiffs motion to summarily dismiss this affirmative defense should be denied. As above, there are issues of fact as to the cause of Plaintiffs' injuries, precluding summary judgment on this affirmative defense.

    5.  *Affirmative Defense Number Eleven*

Defendant's eleventh affirmative defense is that: "Plaintiffs' damages, if any, must be reduced by the percentage of fault this Court determines to be attributable to persons other than the United States, including but not limited to any and all rights to credit, offset, and/or contributions that the United States may have against Plaintiffs." Dkt. 14, at 5.

Plaintiffs' motion to summarily dismiss Defendant's eleventh affirmative defense should be denied. Plaintiffs move for dismissal of this defense arguing that the United States has not named any third parties who are potentially liable. Dkt. 26. While the United States has not named additional parties, Plaintiffs do not deny that they have received benefits from Defendant, including healthcare, etc. Defendant should not be foreclosed from asserting this defense at this time.

### III. ORDER

Therefore, it is hereby, **ORDERED** that:

- Plaintiffs' Motion to Determine Choice of Law (Dkt. 24) is **GRANTED**: Washington substantive law shall be applied to this case;
- Plaintiff's Motion for Partial Summary Judgment (Dkt. 26) is **GRANTED**, as to the Defendant's health care providers breach of the standard of care in failing to document the findings of the January 2, 2007, ultrasound, and as to the dismissal of Defendant's

affirmative defenses four, six, seven, and nine;

- Plaintiff's Motion for Partial Summary Judgment (Dkt. 26) is **DENIED** in all other respects;

The Clerk of the Court is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

DATED this 31st day of March, 2010.

*/s/ Robert J. Bryan*
Robert J. Bryan
United States District Judge

ORDER - 13